UNITED STATES BANKRUPTCY COURT  <u>**NOT FOR PUBLICATION**</u>
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x

In re             Chapter 7
                Case No. 03-37171
   JEFFREY LEE TOGNETTI,

       Debtor.


---------------------------------------------------------x

RACE CAPITAL GROUP LLC and
ERIC ROSS,          Case No. 04-9165 (cgm)

       Plaintiffs,

    -against-

JEFFREY LEE TOGNETTI,

       Debtor/Defendant.
---------------------------------------------------------x

### DECISION AFTER TRIAL: FINGINGS OF FACT AND
### CONCLUSIONS OF LAW PURSUANT TO FED. R. BANKR. P. 7052

<u>**A** P P **E A R A** N C **E** S</u>:

Eric Ross
Plaintiff, *pro se*

Harvey S. Barr, Esq.
Barr & Haas, LLP
664 Chestnut Ridge Road
Spring Valley, New York 10977
*Attorneys for the Debtor*


**CECELIA G. MORRIS**
**UNITED STATES BANKRUPTCY JUDGE**

   Creditors Eric Ross and his corporation, Race Capital Group LLC ("<u>Race Capital</u>"),

commenced this adversary proceeding objecting to the dischargeability of certain debts pursuant

to 11 U.S.C. § 523(a).  Plaintiffs ask this Court to except from discharge a $127,000 judgment entered against the Debtor personally, resulting from the Plaintiffs' business dealings with Syndicate Trading, LLC ("Syndicate Trading "), an investment firm of which the Debtor was the managing member.  In the Complaint and Joint Pre-Trial Order, Plaintiffs claimed that the Debtor persuaded Plaintiffs to open an account at Syndicate Trading as a "Class C" member, and the "Debtor alone had total and complete operational authority over Syndicate Trading and its members." Joint Pre-Trial Order, p. 4, ¶6.  The Debtor allegedly "misrepresented his legal status and deceptive persona by omitting to disclose that he had been convicted of a felony for securities fraud in January 2000," which rendered him "statutorily disqualified" under the securities laws and rules. Joint Pre-Trial Order, p. 4, ¶7.  After only three months, Plaintiffs were terminated as members of Syndicate Trading and never fully recovered the balance of their investment or trading profits.  Plaintiffs contend that the Debtor "never intended to return" these monies "from the inception actually committing a larceny." Joint Pre-Trial Order, p. 4-5, ¶8. Debtor is also alleged to have "maliciously refused" to pay the debt by issuing several checks that did not clear due to insufficient funds or stopped payment.  Joint Pre-Trial Order, p. 5, ¶9-12.  Meanwhile, Debtor allegedly continued to use the same Syndicate Trading bank accounts to purchase luxury items, provide payment to family members and otherwise "illegally appropriated" funds that should have been paid to the Plaintiffs. Joint Pre-Trial Order, p. 5, ¶13.

The Court conducted a trial on February 2, 2007.  Race Capital failed to appear through counsel, and the Court dismissed the case as to Race Capital.  The trial proceeded with Mr. Ross as the only plaintiff, *pro se*.  As discussed below, the evidence presented by Mr. Ross at trial did not support Plaintiffs' characterizations in the Complaint and Joint Pre-Trial Order.  The evidence suggests that the Debtor did not have total authority at Syndicate Trading and was, in

fact, directed by other investors as well as the broker/dealer with which Syndicate Trading was affiliated, to terminate Plaintiffs as members due to Plaintiffs' high-risk trading techniques. Upon termination from Syndicate, the immediate return of Plaintiffs' funds was prohibited by the Securities and Exchange Commission's rules regarding net capital requirements. Meanwhile, the Debtor testified that several other Syndicate Trading members were terminated for illicit activity; that event lead to a "run on the bank" when other members began to demand that their money be returned. At that point, the Debtor testified that the matter was beyond his control. According to the Debtor's unrebutted testimony, the decision to liquidate Syndicate Trading was made by Richard Siegal, a "Class A" member who owned 47% of Syndicate, and Dan Druz, Syndicate's attorney. From the testimony, it appears that one of the checks issued to Plaintiffs was stopped not from a "malicious" motivation but because Syndicate Trading believed that the Plaintiffs failed to comply with a verbal understanding to remain with Syndicate Trading as a retail customer, an arrangement that would subject Syndicate's members to far less risk from Plaintiffs' investment strategies. Finally, evidence at trial revealed that Mr. Siegal assured Plaintiffs that their funds would be returned from Syndicate, that he would "take care of it." Plaintiffs never sued Mr. Siegal. Mr. Ross testified that after Syndicate Trading liquidated he engaged in a business transaction with Mr. Siegal, and that business association continued until November 2004.

The evidence at trial failed to show that the Debtor acted in a "willful and malicious" manner with regard to Plaintiffs or their funds. First, the testimony revealed that the Debtor acted as an officer of Syndicate Trading and did not have unfettered power to decide whether or not to return Plaintiffs' funds. Second, the timing of Plaintiffs' termination from Syndicate Trading (a termination triggered by Plaintiffs' conduct), together with other intervening

circumstances made full repayment to Plaintiffs impossible.  No evidence was presented at trial

as to the personal use by the Debtor of any funds from Syndicate.  Thus, the evidence was also

insufficient to show fraudulent conduct that would support a finding of nondischargeability

under 11 U.S.C. § 523(a)(2), or that the debt resulted from a violation of securities laws under 11

U.S.C. § 523(a)(19).

Although the Court may be sympathetic in that the Plaintiffs have failed to recover a

portion of their funds and profits from Syndicate, well-established law forbids piercing of the

corporate veil to hold officers and directors liable for corporate liabilities solely to satisfy

disappointed creditors.  More importantly, the Court is not at liberty to simply review all of the

circumstances of this bankruptcy case and grant an exception to discharge based on

unsubstantiated testimony from the Debtor's most vocal creditor.  The Bankruptcy Code grants

this Debtor the right to discharge all debts except those debts enumerated in 11 U.S.C. § 523(a).

Unless the nature of the debt or the circumstances from which the debt arose matches each

element of a subsection of Section 523(a), the debt is discharged.  "Because bankruptcy is both a

right of the debtor, and a remedy for the creditor, a proper balancing of those competing interests

requires the creditor to prove by a preponderance of the evidence that its claim is one that is not

dischargeable." *In re Renshaw*, 222 F.3d 82, 86 (2d Cir. 2000) (citations omitted).  "In proving

an exception to discharge under § 523(a), the creditor must prove each and every element of its

case by a preponderance of the evidence." *In re Flaherty*, 335 B.R. 481, 489 (Bankr. D. Mass.

2005) (citing *Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)).

This burden of proof was not met at trial.

## JURISDICTION

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a) and the Standing Order of Reference signed by Acting Chief Judge Robert J. Ward dated July 10, 1984. A determination as to the dischargeability of a debt is a "core proceeding" under 28 U.S.C. § 157(b)(2)(I).

## BACKGROUND

Mr. Ross describes himself in the Complaint as "a seasoned securities and options trader." Complaint, ¶4; Trial Transcript (hereafter, "Tr."), p. 224. Mr. Ross obtained an Accounting Degree from The Wharton School of the University of Pennsylvania and has been a Certified Public Accountant since 1982. Tr. at 177-178. Mr. Ross testified that he became a securities trader in either 1985 or 1986 and became a licensed securities trader around 1990. Tr. at 178. Mr. Ross also testified that he leased a seat on the American Stock Exchange for approximately fifteen years. Tr. at 224.

Mr. Ross responded to Syndicate's advertisement on the Monster.com web site seeking "licensed proprietary traders, who were interested [in] coming to trade [the] firm's capital." Tr. at 101 (testimony by the Debtor), 179 (by Mr. Ross). On October 11, 2001, Mr. Ross and Syndicate Trading entered into an "Amended and Restated C Class Members Agreement" (Trial Exh. 1; hereafter, the "Members Agreement"). Although Plaintiffs' complaint states the Members Agreement was "with Tognetti and corporations of which Tognetti was a principal, Syndicate Trading LLC, Investment Service Capital Corp d/b/a ICAP," *see* Complaint, ¶5, the Members Agreement is signed by Mr. Ross as the Class C Member and by the Debtor as "Designee of the Managing Member" on behalf of Syndicate.

The purpose of the Members Agreement was:

    A.  To provide a venue for the operation of an equities trading business and a venue to promote the purchase and sale of option contracts.

    B.  To operate the business of [Syndicate] for the explicit purpose of maximizing profit.

    C.  Otherwise to own, maintain, manage, and operate any project or any undertaking in which the company is involved, wholly owning Investment Services Capital Corp. with the specific focus on equity, and option contract, purchases and sales.

Members Agreement, Art. II. Mr. Ross explained that Syndicate Trading was a venue for traders to pool their capital and trade through Investment Services Capital Corp. (hereafter, "ISCC"; or sometimes referred to by the parties as "ICAP"), a proprietary broker-dealer owned by Syndicate Trading. Tr. at 137-138; Members Agreement, Art. V, Sec. F. At one point Syndicate Trading had more than 100 traders. Tr. at 240. The Members Agreement gave the Debtor, as the Managing Member, "full authority at all times by the other Members of [Syndicate Trading] to operate [Syndicate Trading] on a day to day basis, subject to such rules, instructions, and directions as promulgated by the Class A Members and the Management Committee." Members Agreement, Art. III. The Members Agreement also states in bold type: "The Managing Member is not a control person of, nor directs the business of the subsidiary broker dealer." *Id.*, Art. V, Sec. B.1.

Mr. Ross was admitted as a Class C member of Syndicate Trading and initially contributed $200,000 by a check from Race Capital dated October 15, 2001. Trial Exh. C. Under the Members Agreement, Class A members would receive a proportional distribution of ISCC's net profits. *Id.*, Art. VIII. Class C members were not entitled to any profits other than the profits resulting from the Class C member's own trading activity. *Id.* In the event that a Class C member withdrew from Syndicate, the Members Agreement provided that Syndicate Trading must pay the member 50% of the amount of the member's capital account, with the balance to be paid out in ten business days "subject to any reserves withheld as set forth herein." Members

- 6 -

Agreement, Art. XIII, Sec. B.1. Each Class C Member's right to return of capital was subject to

a major exception, set forth in the same article of the Members Agreement:

> The Broker Dealer (ISCC) shall be registered with the NASD and, therefore, the
> capital contributed by any Member to the Company may not be withdrawn (i)
> without the prior consent of the NASD on less than six (6) months' written notice
> of withdrawal given not sooner than six (6) months after such contribution shall
> have been made, or (ii) **if such withdrawal was prohibited by the Uniform Net
> Capital Rule**, provided however, that if, at the scheduled date of withdrawal,
> after giving effect to such withdrawal and to any other such withdrawals and any
> payments of Payment Obligations (as defined in Appendix D to the Uniform Net
> Capital Rule), under the Satisfactory Subordination Agreements (as defined in the
> Uniform Net Capital Rule) which are scheduled to occur within six (6) months
> following such withdrawal, the Company and/or any of its subsidiaries or
> affiliates consolidated pursuant to Appendix C of the Uniform Net Capital rule,
> shall fail to satisfy the standard of paragraph (3) of the Uniform Net Capital Rule,
> the date of withdrawal of such Member shall be postponed until withdrawal can
> be effected in conformity with the requirements of said paragraph (e) of the
> Uniform Net Capital Rule.

Members Agreement, Art. XIII, Sec. B.3 (emphasis added); *see also* 17 C.F.R. § 240.15c3-3.

At the time Mr. Ross entered into the Members Agreement with Syndicate Trading, he

hoped to join a hedge fund. Tr. at 179. Mr. Ross testified that he was not a day trader, which he

understood to be: "somebody who trades in and out of a position and out at the end of the day."

Tr. 180. Mr. Ross considered himself: "a position trader, which is different, but I did day trade.

Everyone day trades." Tr. at 180. Mr. Ross testified that he left his prior position because of

newly imposed investment caps. Tr. at 182. When asked why he left his previous employer, Mr.

Ross explained that "the whole firm reduced the amount of capital available to people and I

wanted to go into a hedge fund" and that he was "looking to trade larger positions…." Tr. at 223.

Mr. Ross testified that he read the Members Agreement before he signed it, and that he

understood that Syndicate Trading was not a hedge fund. Tr. at 189. According to Mr. Ross, the

Debtor told him that he would be starting a hedge fund, that he wanted Mr. Ross to participate in

it, and in the interim Mr. Ross should put some money into Syndicate Trading and trade as a

member of that entity.  Mr. Ross told the Debtor: "I need a certain amount of capital, and [the

Debtor] said fine." Tr. at 189.

From the foregoing, it appears to the Court that Mr. Ross sought an opportunity to trade

using a large amount of capital.  Although Mr. Ross would have rather joined a hedge fund,

Syndicate Trading 's opportunity for pooled capital apparently appealed to Mr. Ross.  However,

Mr. Ross's trading techniques immediately caused friction at Syndicate Trading.  Although

Syndicate Trading occasionally permitted positions to be held overnight, the practice was not

favored.  The Debtor testified:

> Syndicate Trading allowed the pooled capital funds contributed to the
> broker/dealer to maintain positions.  At the end of the day if those positions were
> come or coming close to the end of the day, if those positions exceeded the net
> capital rules as required by the NASD or the SEC, the principal, the licensed head
> of the broker/dealer would say, listen Syndicate, the capital you've contributed is
> not enough to carry such positions, please contribute more.

Tr. at 139.

> But at the end of the night is where your true risk is coming into the next day.
> Any event could happen.  The World Trade Center, anything could possibly
> happen, especially then, everything was on edge because of terrorism.  It was
> right after 9/11, and the slightest package found here would shut down everything
> and the market would plummet.  **So positions taken overnight caused
> significant risk.  And the other partners and the management of the
> broker/dealer did not want to take that risk.**

Tr. at 141 (emphasis added).

Although Mr. Ross's aggregate trading losses while a member of Syndicate Trading were

only $7,500 (Tr. at 185), his gains and losses fluctuated significantly.  For example, at the

beginning of December 2001 Mr. Ross's account had an equity balance of $470,000, but Mr.

Ross lost a total of $298,000 during the month. Tr. at 186-187.  The December 2001 losses lead

to a conversation between the Debtor and Mr. Ross in January 2002 during which the Debtor

asked Mr. Ross to increase his equity. Tr. at 187.  Mr. Ross agreed and contributed an additional

- 8 -

$50,000 by a check from Race Capital dated January 23, 2002. Trial Exh. C.  Debtor's counsel

asked Mr. Ross why he agreed to make the additional $50,000 contribution:

> A: Because Jeffrey Tognetti was going to increase my buying power.
>
> Q: Increase your leverage?
>
> A: If you want to call it leverage, sure.

Tr. at 188.  This increase in Mr. Ross's equity did not satisfy other members of Syndicate

Trading and the management of ISCC who insisted on his discharge.  The Debtor was asked

about this in direct examination by his counsel:

> Q: Did they tell that to Mr. Ross?
>
> A: Not only did they tell it to him, they put it in writing to him on numerous occasions.
>
> Q: And is that what precipitated his discharge?
>
> A: Yes.

Tr. at 242.

On February 1, 2002, Mr. Ross and Race Capital were expelled as members of Syndicate,

and the trading privileges were discontinued. Complaint, ¶11.  As of the termination date there

was $242,863.41 in Plaintiffs' capital accounts. Complaint, ¶12.  However, because this amount

was pooled, it remained subject to risk from trading by other Syndicate Trading members. Tr. at

69.  This amount due to Mr. Ross was acknowledged in an undated writing signed by Mr. Ross

and by the Debtor as "Syndicate Trading Managing Member." Trial Exh. 4 (hereafter, the

"Undated Agreement").  Mr. Ross testified that the Undated Agreement was drafted and

executed on March 1, 2002 and "was an agreement that Jeffrey Tognetti and I reached." Tr. at

28.  The Undated Agreement provides:

> I, Jeffrey Tognetti, Managing Member of Syndicate Trading LLC acknowledge
> that Eric Ross has a balance of $218,071.07.  We agree that this balance will be
> paid no later than March 31, 2002.  Upon paying this balance he shall also be
> entitled to the contested splits of $19,055.15 and adjusted ICAP commissions of

$5[,]737.19[1] although Syndicate Trading and ICAP are not obligated to do so.
Upon acceptance by both parties to the above date, the total balance of
$242,863.41 will be paid.

Syndicate Trading LLC will also pay interest on this money for the month of
March a half of a percent.

Syndicate Trading tendered several checks to Mr. Ross. Apparently prior to the Undated

Agreement, Syndicate Trading issued a check for $50,000 dated February 22, 2002, which was

returned for insufficient funds. Trial Exh. 5. Thereafter, Syndicate Trading issued two checks

dated April 3, 2002 for $121,431.00 and $121,432.41 respectively, aggregating $242,863.41.

Trial Exh. 6. One check was returned for insufficient funds, and payment was stopped on the

second check. *Id.*; Tr. at 39-40.

Mr. Ross eventually received $125,000 from Syndicate Trading as partial repayment for

the capital he contributed. Complaint, ¶15; Tr. at 194.[2] In an effort to recover the remaining

money, Mr. Ross and Race Capital commenced an action in the Supreme Court of the State of

New York, County of Westchester against defendants Syndicate Trading , ISCC and the Debtor.

Judgment was entered against all defendants and in favor of the plaintiffs on the eighth cause of

action (for failure of collection on checks), and the plaintiffs were awarded a money judgment in

the sum of $127,246.41 (the amount of the check returned for insufficient funds). The testimony

at trial in this Court did not yield a clear view of why judgment was entered against the Debtor

personally in state court. The Court took judicial notice of the March 10, 2003 short form order

of Justice Louis A. Barone, which provides an account of the relevant state court proceedings:

Dan A Druz, Esq., Defendant's former counsel, submits an affidavit attesting to
the fact that he represented all the Defendants including Mr. Tognetti. On behalf
of all the Defendants, Mr. Druz entered into a settlement and was advised by all

---

[1]      The handwritten initials of "CP" are entered in a blank space following this amount. The Debtor testified
that the initials were those of Craig Paulin, a principal of ISCC. Tr. at 244-245.

[2]      Mr. Ross later received another $40,000 from the proceeds of the sale of real property in the LST Realty
bankruptcy (Case No. 03-37736).

the Defendants that the $120,000.00 was available. Mr. Druz then indicates
because the companies['] "financial conditions" became worse in November
[2002], the $120,000.00 was not available to be paid to Plaintiff and summary
judgment was granted.

*Ross v. Syndicate Trading , LLC*, No. 8162-02 (N.Y. Sup. Ct., March 10, 2003) at 1.

> Plaintiff moves by Order to Show Cause for an order of attachment for three
> parcels owned by Defendant, Jeffrey Tognetti; two in Haverstraw and one in
> Stony Point. Petitioner also seeks a preliminary injunction and temporary
> restraining order prohibiting the Defendants or anyone on their behalf from
> selling, transferring, conveying, encumbering or in any way disposing of the
> properties.

> Plaintiff also seeks a preliminary injunction and temporary restraining order to
> prevent Defendants from liquidating, transferring, withdrawing or transferring any
> property or assets owned individually or by the corporation.

> ***

> After a hearing before this Court on October 17, 2002, Defendants were to pay
> Plaintiff $120,899.20 by October 28, 2002. If payment was not timely made, the
> temporary restraining order would be immediately re-instated, Plaintiff's request
> for a preliminary injunction and order of attachment would be granted and
> Plaintiff could enter judgment against Defendants. Payment was never received
> and by order of November 15, 2002, Plaintiff was to enter judgment.

> ***

> **At the October 17th hearing, Mr. Druz, as counsel for all parties, agreed that
> if the money was not timely paid summary judgment would be entered
> against all parties.** All parties were accountable for payment and all parties
> would be subject to summary judgment. Mr. Druz repeats this position in his
> affidavit annexed to Defendant Tognetti's motion. Therefore, there is no question
> that Mr. Tognetti was represented and is liable as an individual under the
> stipulation of settlement.

Id. at 2 (bold emphasis added). Thus, it appears that the Debtor's personal liability arose from a

deal made through his attorney, who also represented Syndicate Trading and other defendants.

The defendants agreed to personal liability if the funds were not timely paid to Mr. Ross.

On September 10, 2003, the Debtor commenced a bankruptcy case under Chapter 11 of

Title 11; the case was converted to a case under Chapter 7 of Title 11 on November 25, 2003.

On November 19, 2004, Plaintiffs filed this complaint, objecting to the dischargeability

of the state court judgment against the Debtor pursuant to 11 U.S.C. § 523(a)(2)(A), (4) and (6).

At trial, the Court also heard testimony as to whether the debt would be excepted from discharge pursuant to 11 U.S.C. § 523(a)(19).

At the conclusion of Mr. Ross's case, the Debtor moved to dismiss all counts.  The Court granted the Debtor's motion as to the cause of action under Section 523(a)(19). Tr. at 172-173.  The Debtor also withdrew his claims under Section 523(a)(4).  Each of the four causes of action are discussed below.

## DISCUSSION

The Court begins with the "well-established interpretational rule that exceptions from discharge are to be strictly construed so as to give maximum effect to the policy of the bankruptcy code to provide debtors with a 'fresh start'." *Kawaauhau v. Geiger (In re Geiger)*, 113 F.3d 848, 853 (8th Cir. 1997), *aff'd*, 523 U.S. 57 (1998).  As previously noted, a plaintiff carries the burden of proving by a preponderance of the evidence that a debt is excepted from discharge under Section 523(a). *Grogan v. Garner*, 498 U.S. 279, 286 (1991).

## I.    11 U.S.C. § 523(a)(6)

The bulk of the testimony at trial concerned whether the Debtor owed Mr. Ross a debt incurred due to "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).

> The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury.  Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury."  Or, Congress might have selected an additional word or words, *i.e.,* "reckless" or "negligent," to modify "injury."  Moreover … the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts.

*Kawaauhau v. Geiger,* 523 U.S. 57, 61 (1998) (emphasis in original).  The injury caused by the debtor must also be malicious, meaning "wrongful and without just cause or excuse, even in the

absence of personal hatred, spite, or ill-will." *In re Stelluti,* 94 F.3d 84, 87 (2d Cir.1996) (citing

Collier on Bankruptcy). Malice may be implied "by the acts and conduct of the debtor in the

context of [the] surrounding circumstances" *Id.* at 88 (alteration in original, internal quotation

marks omitted). "Maliciousness will be found where the 'debtor has breached a duty to the

plaintiff founded in contract, statute or tort law, willfully in the sense of acting with deliberate

intent, in circumstances where it is evident that the conduct will cause injury to the plaintiff and

under some aggravating circumstance to warrant the denial of discharge.'" *In re Hambley*, 329

B.R. 382, 402 (Bankr. E.D.N.Y. 2005) (quoting *In re Blankfort*, 217 B.R. 138, 144 (Bankr.

S.D.N.Y. 1998)).

At an early point in the trial, the Court attempted to frame the issue under Section

523(a)(6):

> I think I understand the timing of the events that led to Mr. Tognetti's personal
> liability in the state court actions and the circumstances that led to three – we're
> going to call them bad checks. I don't think that's exactly the correct term, but
> three checks that didn't get you paid. Section 523(a)(6), which you pled under …
> it has to be based on more than the fact that you, Mr. Ross, sued Mr. Tognetti in
> state court. And that the state court judge told Mr. Tognetti to pay, and Mr.
> Tognetti didn't or couldn't pay. There has to be another factor, and that has to be
> malicious gloss over these facts to support nondischargeability.

Tr. at 64. Beyond the circumstantial evidence concerning the stopped checks, Mr. Ross did not

provide documents or testimony that would permit this Court to find a "malicious gloss," or the

"aggravating circumstances" referred to in *In re Blankfort* and *In re Hambley*. By contrast, the

Debtor provided extensive, consistent, detailed and credible testimony concerning the

circumstances that gave rise to the debt.

The closest that Mr. Ross came to showing that the Debtor was willfully and maliciously

at fault for the failure to return the funds to Mr. Ross concerned a statement the Debtor made in

an October 16, 2002 affidavit filed in the state court action in support of lifting the temporary

- 13 -

restraining order as to the assets of Syndicate Trading (Electronic Case Filing Docket No. 55,

Exh. C; hereafter, the "State Court Affidavit").  In the State Court Affidavit, the Debtor stated

that Syndicate Trading was "in no way in dire financial straits."  Tr. at 157-158; State Court

Affidavit, p. 5, ¶22.  Mr. Ross's theory is that the Debtor was fully aware, at the time he

executed the State Court Affidavit, that this statement was false, and that Syndicate Trading

would cease operations and dissolve in a matter of weeks; thus, the Debtor allegedly made this

statement to induce the state court judge to lift the temporary restraining order, to the detriment

of Mr. Ross.  This argument relies heavily on the Debtor's statement, in the abstract, that

Syndicate Trading was "in no way in dire financial straits."  In context, the Debtor stated:

> Because of my obligations as the managing member of Syndicate Trading
> to balance the interests of Mr. Ross and the other Class C members; because of
> irregularities in Mr. Ross's trading account in breach of the trading agreement;
> and because of the NASD Net Capital Rule, I authorized the payment of
> approximately half of the funds Plaintiff claims he is due, pending the result of
> my firm's investigation of his trading practices, the imposition of the NASD Net
> Capital Rule, and further negotiations between counsel.
>
> **Business is not great and liquidity is often an issue; however,
> Defendants are in no way in dire financial straits (<u>See</u> Exhibit "4" annexed
> hereto).**  Syndicate Trading is current on all payments to its Class C members;
> ICAP is in full compliance with the NASD Net Capital Rule – although it would
> not be if compelled to pay all of the $120,000.00 demanded immediately and in
> full.

State Court Affidavit, p. 5, ¶21-22 (bold emphasis added).  Though the Debtor's statement that

Syndicate Trading was "in no way in dire financial straits" ultimately proved to be inaccurate, it

was carefully qualified both before and after.  The statement began with the warning that

business was "not great" and was followed by reference to an exhibit (that was not provided to

this Court) and clarified by objective criteria which Mr. Ross has never attacked as false.  The

Court does not believe that this fragment of a sentence, without more, supports a finding that the

Debtor acted with willful and malicious intent.  Even if such a finding were possible, it is not at

- 14 -

all clear that the state court judge's decision to lift the temporary restraining order was based

solely on this one statement; thus, the Court cannot find the necessary causation between this

statement and the resulting debt.  As discussed below, the lack of causation – the nexus between

the debt and the acts of the Debtor that Mr. Ross complains of – is a recurring problem.  Having

heard and carefully reviewed the evidence on the Section 523(a)(6) claims, it appears that there

were several circumstances (including more than one precipitated by Mr. Ross) that were beyond

the Debtor's control, and these circumstances, rather than any willful and malicious motive of

the Debtor, lead to the debt at issue.

Although Mr. Ross contended that the Debtor exercised total authority at Syndicate

Trading (*see* Tr. at 37, 52), the Debtor named three other individuals who had considerable

influence and decision-making authority at Syndicate Trading and ISCC, the broker/dealer: (1)

Victor Tartaglia, the president of ISCC, who reported to Syndicate Trading 's management

committee, of which the Debtor was a member (Tr. at 130-131); (2) Dan A. Druz, Syndicate

Trading 's attorney; and (3) Richard Seigel, a major investor.

Moreover, as referenced in the Members Agreement, the immediate return of Mr. Ross's

capital was prevented by securities laws.  The Debtor testified:

> Vic [Tartaglia] and the members of the actual broker/dealer had to conform to
> what's called [the] Uniform Net Capital Rule.  Normally if a trader wants to
> withdraw funds from the firm, the monies that come to Syndicate Trading that
> Syndicate Trading has loosely available – what I mean by loosely available, not
> encumbered by a deposit, not encumbered by the money on hand at the clearing
> firm, the monies that Syndicate Trading has in free cash – it typically pays out
> those funds out of free cash.  If they can not pay the funds out of free cash
> because the funds are more than what's available in free cash, then we'd have to
> follow the Uniform Net Capital Rule through the broker/dealer and file to have
> those funds released.

Tr. at 142-143.  The Debtor testified that he "did have a say in risk management", but this duty

was shared with "the principals of the broker/dealer to make sure that the capital stayed intact."

Tr. at 128-130.  The Debtor added: "It became a significant issue with Mr. Ross." Tr. at 130.

Mr. Ross first stated that he never received correspondence from anyone at Syndicate Trading

informing him that he had exceeded his trading limits, but then added: "I mean I might have

gotten some document, I don't know." Tr. at 184.  The Debtor testified that Mr. Ross was only

terminated after "[n]umerous warnings, written warnings, numerous violations of the firm's rules

and regulations that were put in place." Tr. at 135-136.  The Debtor's testimony was that it was

Mr. Tartaglia's decision to terminate Mr. Ross, and that the Debtor was not involved in the

decision. Tr. at 135.  "Just the opposite.  I tried to have him make it so he could stay." *Id.*

The Debtor testified that Mr. Ross's tendency to trade great numbers of a particular stock "was a

significant issue" because they were sometimes not as liquid as others.

> A case in point, there was a stock, Auto Zone, was in my opinion his favorite
> stock.  It was illiquid and it traded very sporadically.  One day it would be a
> dollar, next minute it would rocket up.  It was a very dangerous stock to trade in.
> And he took substantial portions in it at times.

Tr. at 241.  According to the Debtor, Mr. Ross's trading activity forced an ultimatum:

> As a matter of fact, I went out of my way for Eric on numerous occasions, in
> terms of the trading limits and such, I did my best to make sure that he could stay
> and he could be accommodated.  Victor and others who were involved with the
> broker/dealer did not see eye to eye.  It came to a point where Vic had said to me,
> **it's either he goes, Jeff, or I go, because there's entirely too much risk
> involved in what he's doing.**

Tr. at 240-241 (emphasis added).

The Debtor explained that although he ultimately authorized the stop-payment order on

one check to Mr. Ross, "I believe that came about when Vic [Tartaglia] and others said that the

net capital wasn't being followed, among other things, and I stopped – I authorized stop payment

of those checks." Tr. at 137.

The Debtor also testified to external factors that prevented full repayment to Mr. Ross. The Court asked the Debtor why Syndicate Trading ceased operations in late October or early November 2002.  The Debtor answered:

> There was a group of individual traders, Russians I think, at least we used to refer to them as the Russians, who some of which had been caught doing illicit things at the firm, and two of the group were expelled.  And their [SEC registration form] U-5s or U-4s marked for what they were doing.  And what that caused was a larger group of traders that consisted of not just those two, but approximately nine or ten others to request to terminate their relationship with the firm.  And it was probably about fourteen people or so I believe.  When that happened, it required a liquidity event that the firm would have to liquidate deposits or take money from the clearing firm to suffice them wanting to leave at that point in time.
>
> In addition, that instability caused other traders to wonder what was going on, and it caused the firm to become unstable.  **A run on the bank, per se, with everyone wanting their capital at once.**  Whereas, these funds were all on deposit in numerous places, and it wasn't planned for, that something like this would take place.

Tr. at 159-160 (emphasis added).  At this point, the Class A members of Syndicate Trading appointed an attorney, Mr. Druz, and it "was his job to regain or recoup or any of the above capital, any distributions." Tr. at 141; 236-237.  The Debtor also testified that the decision to liquidate the company was made not by him, but by Richard Seigel. Tr. at 237.  "He said that …the trading aspect should be closed down and everything should be returned, all the capital, all the deposits and such returned back to the traders.  And that would have included myself as well." Tr. at 237-238.

Mr. Ross asked the Debtor, "what precluded you from paying this money for the period following April all the way through until November?"  The Debtor answered: "Nothing precluded me.  In fact, I did make distributions.  I made distributions in May and April, whatever it was." Tr. at 249.  The Debtor introduced Exhibit H at trial, a letter from Syndicate Trading addressed to Mr. Ross and dated March 1, 2002.  Among other things, the letter explains why the first check for $50,000 (Trial Exh. 5) was returned for insufficient funds.  The letter states:

> **The initial distribution of your capital account with Syndicate
> Trading was to be $50,000 on February 22, 2002. This payment was given to
> you on February 15, 2002 as a courtesy, and you proceeded to deposit the
> check immediately.** Syndicate Trading looks at this as a breach of the good faith
> that we were trying to exhibit.
>
> Therefore Syndicate Trading is considering its option of distributing the
> money in your capital account in accordance with the guidelines set forth in the
> Syndicate Trading Agreement.
>
> Your termination date from ICAP, was February 1, 2002. Therefore you
> are intitled [sic] to receive half of the funds in your capital account 25 business
> days from that date which is March 8th. The balance will be sent to you 90 days
> thereafter which is June 6, 2002. This is subject to any monies for contingent
> liabilities that Syndicate Trading may retain as outlined in the Syndicate Trading
> Agreement.
>
> The above guidelines are what Syndicate Trading is obligated to follow.
> But we will make an effort to settle this issue and refund the balance of your
> capital account sooner.

(emphasis added). Mr. Ross filed the state court action against the Syndicate Trading and the

Debtor prior to June 6, 2002. As soon as Ross began litigating, the Debtor testified that, "the

matter was taken out of my hands". *Id.* At that point, the Debtor testified: Dan [Druz], who was

the attorney representing the firm, took over, there was other people involved, and I was

extricated from the situation. The minute [Mr. Ross] filed the lawsuit I was taken out of the

loop." *Id.*

Mr. Ross eschewed the March 1, 2002 letter and referred the Court to the undated

agreement submitted as Trial Exh. 4, discussed *supra*. Mr. Ross contends that this agreement,

purportedly reached on March 1, 2002, superseded all other agreements. Tr. at 34-35. The

Debtor testified as to the twofold circumstances of the promise to repay Mr. Ross in Exhibit 4:

> [W]e had agreed, not in writing, but with Craig Paulin and others that Mr. Ross
> would be able to continue trading at our firm using our technology, using the
> things that we did, but in a retail capacity. Even though he wouldn't be afforded
> the same leverage, he'd be afforded similar leverage because Richard Seigel and
> other partners would be willing to pool capital that they would deposit on a
> nightly basis into that account to cover any margin call. It would be zero risk to
> them because all the transactions, the buying and selling for the day, would be
> met flat. If you want to take home positions overnight, the only amount that he

would have been able to take home overnight were whatever the Regulation T rules[3] were for a retail account.

Eric had complained that the amount of money that he'd require to do so would be rather large. So as an added incentive for him to stay at the firm – as you saw he generated substantial commissions – as an added incentive for him to stay at firm we offered to meet those margin calls and give him back the splits, the splits on profits. What that means is for October and November Mr. Ross was profitable and the firm, Syndicate Trading , as per its signed agreement was due profit splits and commission dollars. We didn't take them. At end of the day we applied them back to him in this document. Craig Paulin initialed it because he was a registered principal with the broker/dealer. I couldn't authorize just giving commissions back without a registered principal. So he signed off saying that the broker/dealer would give commissions back, and that's how we had ended, believing that Eric Ross was going to come back and trade in a retail range.

Tr. at 244-245. According, to the Debtor, Mr. Ross told him that he would come back with a

check for the retail account, but never did. Tr. at 245.

Mr. Ross denies the facts above and provided an entirely different perspective when

examined by Debtor's counsel. According to Mr. Ross, "Jeff Tognetti and I just said, you know

what, he was unhappy and I was unhappy, I was unhappy with some of the systems there, and he

was unhappy with me, and that was why." Tr. at 190. Debtor's counsel asked:

Q: So why didn't you just quit. Why did they have to terminate you?

A: It was a mutual termination, and I just said okay, just give me back my money.

Q: Did you ever have any conversation with Mr. Tognetti about trading as a retail customer?

A: Absolutely not.

Q: Do you know what a retail customer is?

A: Of course I do.

Q: What's the difference?

A: The difference between a retail customer and what – I'm sorry? The difference between?

Q: A retail customer and what you were, a proprietary trader?

A: A retail customer has limited use of their capital – limited capital, they are subject to Regulation T requirements. And [a] professional trader, like I was, was able to use whatever money was available to – to use as their funds.

---

[3]     *See* 12 CFR 220.1 through 220.19.

Q: Did you understand that you could use anybody's money, yours or anybody else's?

A: That is typically how the proprietary firms trade.

Q: With limits?

A: Not necessarily with limits anywhere.

Tr. at 190-191.  The issue to be decided is not whether Mr. Ross agreed to open a retail account with Syndicate Trading.  The issue is whether Mr. Ross can show that the Debtor willfully and maliciously caused checks issued to Mr. Ross to be stopped or returned unpaid.  Mr. Ross has not made this showing, and the Debtor has provided credible testimony as to several other factors that prevented payment to Mr. Ross.

Finally, Mr. Ross's own testimony regarding his relationship with Richard Seigel weighs against the theory he advances in this case, that the Debtor had total control over Syndicate Trading and maliciously refused to pay Mr. Ross.  Mr. Ross testified that he spoke to Mr. Seigel about the return of his contributions to Syndicate Trading .  "He just said to me I will take care of it." Tr. at 196-197; 227-228.  Mr. Ross testified that he first met Seigel in December 2001 and "did a business transaction together." Tr. at 197.  Specifically, Mr. Ross bought an oil and gas product from Mr. Seigel at the end of December 2001. Tr. at 198; 228-229.  This partnership continued until November 2004.[4]  The Debtor testified that "the oil prices went up and I got – he gave me a distribution on that basis of the higher oil price." Tr. at 230-231.  Mr. Ross confirmed that he never sued Mr. Seigel for failure to return the funds he contributed to Syndicate Trading .  Tr. at 231.

---

[4]       At page 230 of the Trial Transcript Mr. Ross purportedly answered that he received this distribution in 2000, which would be anachronistic in relation to both the date when he testified that he met Mr. Seigel and began to do business with Mr. Seigel.  The Court suspects that this is a transcription error.  Other portions of the Transcript suggest that the date was November 2004. *See* Tr. at 230:21; 231:5.

## II.    11 U.S.C. § 523(a)(2)[5]

Mr. Ross contends that the Debtor made certain fraudulent representations that he could legally conduct business as a securities trader.  Specifically, Mr. Ross claims that the Debtor "represented to the plaintiffs that he would distribute profits to the plaintiffs and would return to the plaintiffs the proceeds of their capital account," and that these representations "were made purposefully and with an intent to deceive." Complaint, ¶19-20.  Plaintiffs also claim that they relied on these representations, along with the Debtor's representation "that he could legally conduct business as a securities trader." Complaint, ¶ 18, 21.

### A.  Fraud and False Pretenses

A debt is not dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) to the extent that it is "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by – (A) false pretenses, a false representation, or actual fraud[.]"

To show fraud in this context, Mr. Ross must prove each of five elements: (1) that the Debtor made a representation to Mr. Ross; (2) that the Debtor knew the representation was false when made; (3) that the Debtor intended to deceive Mr. Ross in making the representation; (4) that Mr. Ross's reliance on the representation was justifiable; and (5) that Mr. Ross suffered damage as a result. *See, e.g., In re Dobrayel*, 287 B.R. 3, 12 n. 3 (Bankr. S.D.N.Y. 2002).

---

[5]    At the beginning of trial, the Court indicated that testimony should first be presented on the less fact-intensive causes of action under 11 U.S.C. § 523(a)(6) and (19). Tr. at 14.  The Court reasoned that if Mr. Ross could demonstrate liability under Section 523(a)(6) or (19), it would not be necessary to present evidence on the Section 523(a)(2) cause of action.  The presentation of evidence at trial did not necessarily adhere to this structure, and the during the presentation of his case, Mr. Ross had a full opportunity to present evidence as to all of his claims.  At the close of his case, Mr. Ross confirmed that he had nothing further to add. Tr. at 172.  Mr. Ross then agreed to excuse two witnesses who would present rebuttal evidence as to claims under Section 523(a)(2) and (4). Tr. 173-175.  Moreover, as discussed in this section, the Court asked Mr. Ross at several points to present all of his evidence of fraud. Tr. at 31, 42, 59.  At the conclusion of the day of trial, the Court gave Mr. Ross a further opportunity to examine the Debtor with regard to "any other direct testimony." Tr. at 248.  The Court asked Mr. Ross once more if he had anything further to add or to present to the Court, and when Mr. Ross answered in the negative, the Court indicated that the matter would be regarded as fully submitted. Tr. at 250.

"While 'actual fraud' generally requires proving the 'five fingers of fraud,' ... such elements need not be shown to establish either 'false pretense' or 'false representation'." *In re Dobrayel*, 287 B.R. at 12 (footnote and internal quotations omitted) (quoting *In re Kovler,* 249 B.R. 238, 260 (Bankr. S.D.N.Y. 2000)).  False pretense has been defined as: "conscious deceptive or misleading conduct calculated to obtain, or deprive another of, property. It is the practice of any scam, scheme, subterfuge, artifice, deceit or chicane in the accomplishment of an unlawful objective." *In re Kovler,* 249 B.R. at 261 (citing cases).  A false pretense is promoted "willingly and knowingly by a defendant and is not the result of unintentional conduct or an unintentional misrepresentation." *Id.*  Failure to disclose material facts on which a transaction depends constitutes false pretenses within the statute. *In re Soliz,* 201 B.R. 363, 369 (Bankr.S.D.N.Y.1996).  Thus, "to establish a debt is non dischargeable as a debt for money obtained by false pretenses, the plaintiffs must establish (1) an implied misrepresentation or conduct by the defendants; (2) promoted knowingly and willingly by the defendants; (3) creating a contrived and misleading understanding of the transaction on the part of the plaintiffs; (4) which wrongfully induced the plaintiffs to advance money, property, or credit to the defendant."

At trial, Mr. Ross presented no concrete evidence on the issue of fraud or false pretenses.
First, Mr. Ross testified that he made his own trading and investment decisions.

> The Court: No one else invested your money but you?
>
> Mr. Ross: Correct.
>
> The Court: So Mr. Tognetti did not invest your money, that's fair to say?
>
> Mr. Ross: They did have control of positions and dollar amounts.  And in the event that – well, I can't ... in the event that the positions were – they had ability to remove positions from your account.  They had discretion to remove positions from your account.

Tr. at 32.  Mr. Ross testified that Syndicate Trading "may have" caused his overnight positions to be sold, but this did not occur more than once, and Mr. Ross never testified that the sale of this

overnight position, if it occurred, resulted in a loss. Tr. at 184-185.  Debtor's counsel asked Mr.

Ross:

> Q: Did they [Syndicate] in any way inhibit your ability to trade what you were trading?
>
> A: Only towards the end when I had differences with Jeff.  That was the end.

Tr. at 225.

> Q: So each and every trade that you had while you were at Syndicate Trading was some stock or security that you had determined was appropriate to purchase and you determined the time to sell, correct?
>
> A: Except for when – there were times when we would have the liquidation, but that was a decision that was made between me and Jeff Tognetti.
>
> Q: So you participated in that?
>
> A: I participated.

Tr. at 185.

> Q: Did you have any disagreements with Mr. Tognetti about the nature of your account while you were there and your ability to trade?
>
> A: Yes.
>
> Q: And what were the discussions about?
>
> A: I guess trading amounts.
>
> Q: So you were upset that they didn't allow you to trade higher than you wanted to trade?
>
> A: Yes.
>
> Q: And other than that, did they allow you to trade within the limits?
>
> A: Always.
>
> **Q: Did they tell you which stocks to purchase?**
>
> **A: No.**
>
> Q: Did they tell you which stocks to sell?
>
> A: There were times.
>
> Q: And what would they tell you?
>
> A: They reduced the position.  If Jeff said you have to reduce this position.
>
> Q: Meaning you had too much of a particular security?
>
> A: Not necessarily too much.  He just didn't like – he didn't like where it was.
>
> Q: What do you mean by where it was?

A: He had his own opinion on where it was.

**Q: Okay. And he had the right to not allow you to purchase it, correct?**

**A: He did.**

Tr. at 225-226 (emphasis added). Mr. Ross testified that he was permitted to trade freely within

the limits set forth in the Members Agreement. The Debtor only interfered with Mr. Ross's

trading activity when he was authorized and obligated to do so under the Members Agreement.

*See* Members Agreement, Arts. III and VI. Mr. Ross also testified that he received regular and

accurate accountings of his trading accounts.

Q: While you were trading [at Syndicate], did you get an accounting of what you
were trading? You got sheets there, right?

A: Yes.

Q: And presumably you understood what you traded that day, so you knew
whether they were reasonably accurate or not, right?

A: Yes.

Tr. 216-217.

Mr. Ross also sought to hold the Debtor accountable based upon his belief that as of the

Undated Agreement, Syndicate Trading had sufficient funds on hand to repay him in full. Mr.

Ross contends that the Undated Agreement "superseded everything else and basically says that

Syndicate Trading , Jeffrey Tognetti as managing member acknowledges that Eric Ross has this

balance," and that the Undated Agreement "effectively assigns to Eric Ross back his money in

agreement, and anything that's in this other [previous] agreement as to the origination is no

longer as pertinent as the entitlement that Jeffrey Tognetti acknowledges Eric Ross having a

balance, and that upon the acceptance of the above date the balance will be paid." Tr. at 34-35.

Mr. Ross blames the Debtor for the fact that Syndicate Trading did not, in fact, repay him as

promised in the Undated Agreement. The Court asked Mr. Ross how he could prove that the

Debtor was somehow responsible for the failure to repay him as provided in the Undated

- 24 -

Agreement and why, for example, the funds could not have become unavailable due to an

investment loss.  The Debtor responded: "The only way I can prove that the money was still

available after – up at this date of March 31st, 2002, when the money was supposed to be paid,

was that Jeffrey Tognetti testified that there was more than enough money to be paid." Tr. at 59.

When the Court asked Mr. Ross if he was the only one to whom Syndicate Trading owed money

at that time, Mr. Ross replied: "I would not know." Tr. at 64.

     Mr. Ross also failed to demonstrate that the Debtor engaged in any fraudulent conduct

concerning misuse of Syndicate Trading funds.  Mr. Ross testified that the state court ordered his

funds returned because "Justice Barone heard that Jeffrey Tognetti's position as the managing

member and he had submitted documentation that showed that they – that there were personal

expenses going through the account, and several other items, and that's why Judge Barone

(inaudible)." Tr. at 71.  It is significant that no such documentation was presented to this Court at

trial.  The Court has reviewed Justice Barone's March 10, 2003 order, which summarizes various

allegations made by Mr. Ross, one of the plaintiffs in that action.  However, Justice Barone only

concluded that: "After reading all of the papers submitted, there are very real questions of fraud,

manipulation and contrivance." *Ross v. Syndicate Trading , LLC*, No. 8162-02 at 4.  Judge

Barone's March 10, 2003 order made no findings of fraud, manipulation or contrivance.

     The only specific testimony regarding the Debtor's personal use of Syndicate Trading

property was the Debtor's testimony that he drove two cars, a Range Rover and a Jaguar, that

were purchased in Syndicate Trading's name. Tr. at 238.  The Debtor testified that he eventually

sold these vehicles and deposited the funds in the Syndicate Trading bank account, and the

proceeds were used to pay Syndicate Trading's staff. Tr. at 238.

Mr. Ross agrees that the Debtor never mismanaged the proprietary trading account. Tr. at

16-17.  Rather, Mr. Ross argued that Syndicate Trading's capital account was mismanaged, and

the only documents offered as proof were the Members Agreement and the Undated Agreement.

The Court pressed Mr. Ross for additional proof of mismanagement of Syndicate Trading's

capital account:

> THE COURT: Is there anything else you want to add about contending that Mr.
> Tognetti mismanaged the capital account and how?  You've answered it with
> these two documents.  What else do you wish to add?
>
> MR. ROSS: Nothing.

Tr. at 31.

Mr. Ross also contended that the checks from Syndicate Trading were stopped or

returned because Mr. Tognetti had converted the funds to his own personal use.  The Court asked

Mr. Ross for proof of this:

> THE COURT: Okay, now then, you've made another allegation.  What
> documents do you have to support that he converted it to his own personal use, or
> even what testimony – I'm going to help you a bit here, because you are *pro se*.
> In discovery you had the ability to take a deposition and ask these questions.
> Have you asked these questions, and do you have them on deposition?  In
> discovery you were allowed to find out about his accounts.  Do you have that?
>
> MR. ROSS: I was unable to obtain access to that.

Tr. at 42.[6]  The Court asked again: "Do you have any documentary evidence or any testimonial

evidence in deposition of the conversion of this money that you say happened?" Tr. at 43.  Mr.

Ross referred the Court to the temporary restraining order issued by Judge Barone and to the

"public record" of the transfer of Syndicate Trading properties to Leno Tognetti, the Debtor's

father. Tr. at 44.  The Court has already explained that Justice Barone's March 10, 2003 order

was based not on a finding of fraud but only upon allegations in papers presented to him that

---

[6]      It should be noted that at the time of trial this adversary proceeding had been pending for more than two
years.  Mr. Ross has appeared before the Court personally many times.  If Mr. Ross's inability to obtain access to
documentation was the result of non-compliance by the Debtor or a third party, there is no doubt that Mr. Ross knew
how to ask the Court for assistance.  He did not do so with regard to these documents.

raised "very real questions" of fraud.  The latter contention concerns the transfer of real property

and not Mr. Ross's funds.  In any event, Mr. Ross testified that he received $40,000 from the

LST Realty bankruptcy case when that property was eventually sold. Tr. at 44-45; *see also* June

10, 2004 Stipulation (ECF Docket No. 106), *In re LST Realty Corp.*, No. 03-37736 (Bankr.

S.D.N.Y. 2003).

Mr. Ross contends that it was not until he was discharged as a member of Syndicate

Trading that he discovered that the Debtor "was a convicted felon, having been found guilty of

securities fraud on January 6, 2000" and thus allegedly "ineligible to participate in securities

trading" during the time Mr. Ross did business with Syndicate. Complaint, ¶17.  The Debtor

testified that he discussed his conviction with Mr. Ross (Tr. at 103-104), that his conviction was

commonly known among traders (Tr. at 103), reported in the *The New York Times* and the *The

Wall Street Journal* (Tr. at 107) and in publicly filed documents (Trial Exh. 8, Tr. at 96-97) and

also could have been easily discovered by searching the NASD web site (Tr 107).  Regardless of

whether the Debtor misrepresented or failed to disclose his qualification (or lack thereof) to

legally conduct business as a securities trader, Mr. Ross testified unequivocally that Mr. Ross

made the investment decisions, and that his money was never invested by the Debtor. *See, e.g.,*

Tr. at 31-32; 185; 225-226.  With regard to Mr. Ross, it is undisputed that the Debtor never

acted as a securities trader.  Thus, Mr. Ross has provided no evidence or explanation how this

alleged misrepresentation would have resulted in the debt at issue here.  A misrepresenation that

has no causal relation to damages does not constitute non-dischargeable fraud or false pretenses

pursuant to 11 U.S.C. § 523(a)(2)(A).

### B. **Veil Piercing**

The Debtor testified he never dealt with Mr. Ross in an individual capacity and only as the managing member of Syndicate Trading . Tr. at 240.  Mr. Ross agreed that he contributed his money to Syndicate Trading and not the Debtor. Tr. at 215.  The Court asked Mr. Ross why the Debtor should be personally liable under Section 523(a)[7] for the debt of Syndicate Trading.  Mr. Ross answered that the Debtor "was the only managing member" and the only officer in Syndicate Trading . Tr. at 52.  "There was no higher party," and any decisions "came from him solely." Tr. at 52.  The Court asked several times for specific evidence as to why the Debtor should be personally liable for Syndicate Trading 's debt:

> THE COURT: And are you saying, Mr. Ross, that Syndicate, of which Mr. Tognetti was the managing member, was holding onto your money, and that Mr. Tognetti should be liable for not giving it back?
>
> MR. ROSS: I am saying that Mr. Tognetti had total authority over Syndicate Trading , and he – his act, with his control and ability to control the financing….

Tr. p. 37.  Next, the Court asked Mr. Ross to describe any specific wrongful acts committed by Mr. Tognetti, and Mr. Ross offered evidence of checks from Syndicate Trading that were stopped or returned for insufficient funds. Tr. 38-40; Trial Exh. 5 and 6.  On this line of questioning, the Court asked:

> THE COURT: And I want to be clear about why you say that Mr. Tognetti is individually responsible for this?
>
> MR. ROSS: Because the servant is responsible for his tort.
>
> THE COURT: This is a corporation, LLC, remember.…
>
> MR. ROSS: Yes, Mr. Tognetti is the servant of the master, and I believe that he is personally responsible for the willful stopping of these checks.

---

[7]      The Court emphasizes that this discussion is not intended to review the state court's decision to hold the Debtor personally liable to Mr. Ross.  This Court would be prevented from doing so by the *Rooker-Feldman* doctrine. *See District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 482-84 n. 16, 103 S.Ct. 1301 (1983). The following discussion is intended solely to examine whether the Debtor's conduct in his capacity as an officer of Syndicate Trading, the entity with whom Mr. Ross had the business relationship, would render his debt to Mr. Ross nondischargeable under any subsection of 11 U.S.C. § 523(a).

THE COURT: Okay, now, let me ask you something. Then your testimony here is that the stopping of these checks was a tort?

MR. ROSS: Not – the stopping of the checks and the non-replacement going forward with the sufficient time to have done so between the period when the promise was made and the consequential continuance of the firm and for the reasons that the stoppage occurred.

Tr. at 40. The Court has previously found that the circumstances surrounding the stopped and returned checks do not indicate that the Debtor acted with a willful or malicious intent. Mr. Ross also appears to be arguing that the Debtor should be personally liable for Syndicate Trading's debt because he acted as Syndicate Trading's managing member and officer and exercised substantial decision-making authority on behalf of Syndicate Trading. Mr. Ross's arguments here do not describe a debt that would be non-dischargeable under Section 523(a); more fundamentally, these acts would not result in personal liability to the Debtor at all.

As a general rule, the corporate veil cannot be pierced to satisfy every disappointed creditor. *Scarbrough v. Perez*, 870 F.2d 1079, 1084 (6th Cir. 1989) ("corporate veil may not be pierced without a showing of fraud or injustice separate and apart from the corporation's failure to pay its debt – and no such showing was made here").

To pierce the corporate veil under New York law, a plaintiff must prove that: (1) the owner exercised such control that the corporation has become a mere instrumentality of the owner, who is the real actor; (2) the owner used this control to commit a fraud or "other wrong"; and (3) the fraud or wrong results in an unjust loss or injury to the plaintiff.

*In re Vebeliunas,* 332 F.3d 85, 91-92 (2d Cir. 2003). The testimony at trial did not show that Syndicate Trading was merely an instrumentality of the Debtor, or that the Debtor used his position of authority at Syndicate Trading to commit a fraud or other wrong against Mr. Ross. It should also be noted that a corporate officer charged with inducing the breach of a contract between the corporation and a third party is immune from liability so long as the officer acts in good faith and does not commit independent torts or predatory acts. *City of New York v. New*

*York Cross Harbor R.R. Terminal Corp.,* 2006 WL 140555 at * 20 (E.D.N.Y. Jan. 17, 2006); *See*

*also Mobile Data Shred, Inc. v. United Bank of Switzerland,* 2000 WL 351516, at *7 n. 9

(S.D.N.Y. April 5, 2000) ("officers, directors or employees of a corporation are not personally

liable…if they act on behalf of the corporation and within the scope of their duties") (citations

omitted); *Cf. Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1177 (2d Cir. 1993) (director not

personally liable for corporation's contractual breaches absent assumption of personal liability,

act in bad faith or commission of a tort in connection with the performance of the contract)

(citing *Murtha v. Yonkers Child Care Ass'n, Inc.,* 45 N.Y.2d 913, 915, 411 N.Y.S.2d 219, 220

(1978)). Thus, "even if it is shown that [a corporate officer or director] failed to act in good

faith, liability will not be imposed absent a showing of an independent tort, or that the actions

were designed to serve a personal interest." *Craig v. First Web Bill, Inc.,* 2004 WL 2700128 at

*9 (E.D.N.Y. Nov. 9, 2004). The Debtor testified that on behalf of Syndicate Trading, he

stopped payment on the check to Mr. Ross, and that this decision was motivated by a variety of

factors, including the net capital rule and the perception that Mr. Ross failed to open a retail

account with Syndicate Trading as agreed. This act, without more, did not render the Debtor

personally liable for Section 523(a) purposes.

### C.  11 U.S.C. § 523(a)(2)(B)

Though not plead, the Court is mindful that pursuant to 11 U.S.C. § 523(a)(2)(B), the use

of a "materially false" written statement with respect to the financial condition of the Debtor or

an insider (such as Syndicate Trading ) could result in nondischargeability of a resulting debt.

The analysis in Part I, *supra*, regarding Mr. Ross's Section 523(a)(6) claim applies here as well.

Mr. Ross has suggested, but failed to show, that the Debtor intended to mislead him by use of the

Undated Agreement or State Court Affidavit. It is not even clear that anything in the Undated

Agreement or State Court Affidavit was "materially false" at the time the Debtor published it.

Instead, the testimony at trial revealed that the financial circumstances at Syndicate Trading were

changing rapidly during the period in question, and these factors, which were beyond the

Debtor's control, prevented Syndicate Trading from returning Mr. Ross's funds.

**III.   <u>11 U.S.C. § 523(a)(19)</u>**

In the Joint Pre-Trial order, Mr. Ross raised the issue of whether the debt is non-

dischargeable pursuant to 11 U.S.C. § 523(a)(19).  The Court permitted the untimely

consideration of this cause of action in deference to Mr. Ross's *pro se* status but dismissed the

claim at the conclusion of the Debtor's evidence.

Section 523(a)(19) excepts from discharge any debt:

(19) that –
   (A) is for –
      (i) the violation of any of the Federal securities laws (as that term is defined in section 3(a)(47) of the Securities Exchange Act of 1934), any of the State securities laws, or any regulation or order issued under such Federal or State securities laws; or
      (ii) common law fraud, deceit, or manipulation in connection with the purchase or sale of any security; and
   (B) results, before, on, or after the date on which the petition was filed, from –
      (i) any judgment, order, consent order, or decree entered in any Federal or State judicial or administrative proceeding;
      (ii) any settlement agreement entered into by the debtor; or
      (iii) any court or administrative order for any damages, fine, penalty, citation, restitutionary payment, disgorgement payment, attorney fee, cost, or other payment owed by the debtor.

Section 523(a)(19) applies retroactively to debts incurred prior to the date the exception was

added. *See In re Gibbons*, 311 B.R. 402, 403-404 (S.D.N.Y. 2004).

Plaintiffs proposed to offer at trial, among other things, "The Rules promulgated by the

NASD manual and SEC law governing statutory disqualification including NASD forms MC-

400 and MC-400 A." Joint Pre-Trial Order, p. 9. The only documentation submitted to the Court

at trial appeared to be an excerpt from the NASD Manual. *See* Tr. at 74-78; available on the

organization's website*,* http://nasd.complinet.com/nasd/display/index.html. The excerpt focused

primarily on NASD members and how NASD members could sponsor the association of a

disqualified person. *See* Tr. at 87-89. It did not provide any illumination as to what the Debtor

was disqualified from doing. Mr. Ross's case on this point went no further than to allege that the

Debtor was "statutorily disqualified," and it was left for the Court to determine whether the

Debtor violated any securities law, rule or regulation.

Although the law provided by Mr. Ross was insufficient, the Court endeavored to

research the relevant securities laws. The Debtor was convicted of violating Section 77q(a) of

the Securities Exchange Act of 1934, title 15 United States Code. *See* Debtor's Trial Exh. S. 15

U.S.C. § 77q(a) states:

> (a) Use of interstate commerce for purpose of fraud or deceit
>
> It shall be unlawful for any person in the offer or sale of any securities or any
> security-based swap agreement (as defined in section 206B of the Gramm-Leach-
> Bliley Act) by the use of any means or instruments of transportation or
> communication in interstate commerce or by use of the mails, directly or
> indirectly
>
>> (1) to employ any device, scheme, or artifice to defraud, or
>> (2) to obtain money or property by means of any untrue statement of a
>> material fact or any omission to state a material fact necessary in order to
>> make the statements made, in light of the circumstances under which they
>> were made, not misleading; or
>> (3) to engage in any transaction, practice, or course of business which operates
>> or would operate as a fraud or deceit upon the purchaser.

*See* Debtor's Trial Exh. S. No evidence was presented as to the restrictions placed on the Debtor

as a result of this conviction. The Court was only presented with conclusory testimony that the

Debtor was prohibited from certain conduct related to securities trading. The Debtor testified

that he was: "statutorily disqualified from associating with a broker/dealer in the capacity of

being an officer, a control person of the broker/dealer." Tr. at 112.  Yet the Debtor also testified

that he was not required to register with the NASD in order to trade with Syndicate Trading

because he was not executing trades, and because "[a] registered representative was on the

opposite end of the machine executing trades, as was approved by the NASD and the SEC, not

just from my firm at the time, but everyone else who was day trading." Tr. at 162.  For the

purposes of this discussion the Court will assume that the Debtor's conviction resulted in his

"statutory disqualification."

15 U.S.C. § 78c(a)(39), the Securities Exchange Act of 1934 provides the definition of

statutory disqualification and states in relevant part:

> (39) A person is subject to a "statutory disqualification" **with respect to
> membership or participation in, or association with a member of, a self-
> regulatory organization**, if such person–
>
> > (A) has been and is expelled or suspended from membership or participation
> > in, or barred or suspended from being associated with a member of, any self-
> > regulatory organization, foreign equivalent of a self-regulatory organization,
> > foreign or international securities exchange, contract market designated
> > pursuant to section 5 of the Commodity Exchange Act (7 U.S.C. 7), or any
> > substantially equivalent foreign statute or regulation, or futures association
> > registered under section 17 of such Act (7 U.S.C. 21), or any substantially
> > equivalent foreign statute or regulation, or has been and is denied trading
> > privileges on any such contract market or foreign equivalent;
> >
> > ***; or
> >
> > (F) has committed or omitted any act, or is subject to an order or finding,
> > enumerated in subparagraph (D), (E), (H), or (G) of paragraph (4) of section
> > 78o(b) of this title, has been convicted of any offense specified in
> > subparagraph (B) of such paragraph (4) or any other felony within ten years of
> > the date of the filing of an application for membership or participation in, or to
> > become associated with a member of, such self-regulatory organization, is
> > enjoined from any action, conduct, or practice specified in subparagraph (C)
> > of such paragraph (4), has willfully made or caused to be made in any
> > application for membership or participation in, or to become associated with a
> > member of, a self-regulatory organization, report required to be filed with a
> > self-regulatory organization, or proceeding before a self-regulatory
> > organization, any statement which was at the time, and in the light of the
> > circumstances under which it was made, false or misleading with respect to

> any material fact, or has omitted to state in any such application, report, or
> proceeding any material fact which is required to be stated therein.

(emphasis added).

"Member" is defined in 15 U.S.C. § 78(c)(3)(A):

> The term "member" when used with respect to a national securities exchange
> means (i) any natural person permitted to effect transactions on the floor of the
> exchange without the services of another person acting as broker, (ii) any
> registered broker or dealer with which such a natural person is associated, (iii) any
> registered broker or dealer permitted to designate as a representative such a
> natural person, and (iv) any other registered broker or dealer which agrees to be
> regulated by such exchange and with respect to which the exchange undertakes to
> enforce compliance with the provisions of this chapter, the rules and regulations
> thereunder, and its own rules.

A "self-regulatory organization" is defined as "any national securities exchange,

registered securities association, or registered clearing agency." 15 U.S.C. § 78c(a)(26).

Mr. Ross argued that the Debtor violated securities laws because: "He ran a securities

firm. He took money as a managing member. He was also a significant owner of Syndicate

Trading." Tr. at 81. The evidence at trial does not show that the Debtor acted as a member or

participated in a self-regulatory organization. The Debtor was the managing member of

Syndicate Trading, and Syndicate Trading owned ISCC, the broker/dealer that would be

considered the "member" or "self-regulatory organization." Thus, the Debtor was one step

removed and was not "associating" with a member of a self-regulatory organization as that term

is defined in 15 U.S.C. § 78c(a)(21):

> The term "person associated with a member" or "associated person of a member"
> when used with respect to a member of a national securities exchange or
> registered securities association means any partner, officer, director, or branch
> manager of such member (or any person occupying a similar status or performing
> similar functions), any person directly or indirectly controlling, controlled by, or
> under common control with such member, or any employee of such member.

The Court has already noted that the evidence does not support Mr. Ross's contention that the

Debtor improperly "controlled" Syndicate Trading or ISCC. To the contrary, the testimony

- 34 -

suggests that the Debtor, on behalf of Syndicate Trading, dealt with Victor Tartaglia (Tr. at 128-132; 139; 141) or Craig Paulin (Tr. at 244-245), each on behalf of ISCC.  It also appears that Mr. Tartaglia insisted on the dismissal of Mr. Ross from Syndicate Trading (Tr. 135; 240-242) and prevented the immediate return of Mr. Ross's funds due to Uniform Net Capital requirements. Tr. at 137; 142-143.

Moreover, even if the Debtor somehow violated one or more of the above sections, it is difficult to see how this would have caused the debt to Mr. Ross.  Pursuant to 11 U.S.C. § 523(a)(19), a creditor must show that the debt is "for" the violation of a securities law and "results" in a "judgment, order, consent order, or decree," "settlement agreement," or other "court or administrative order."  A securities violation alone, without a causal relationship to a resulting debt is insufficient for liability under Section 523(a)(19).

It bears repeating that whether or not the Debtor actually complied with all of his obligations under the securities laws is beyond the scope of this decision.  All that the Court holds today is that Mr. Ross has failed to meet his burden of proving (by the presentation of admissible evidence) that the Debtor violated any securities law, and Mr. Ross has accordingly failed to demonstrate any connection between such a violation and the resulting debt.

## IV.    11 U.S.C. § 523(a)(4)

In the Complaint, Plaintiffs alleged that the Debtor controlled the capital accounts and was entrusted with the funds.  Plaintiffs allege that the Debtor converted the funds in violation of his position of trust and confidence. Complaint, ¶25-29.  Although Mr. Ross withdrew his Section 523(a)(4) claims at trial, it is appropriate to set forth the elements that Mr. Ross would have been required to prove.

- 35 -

A debt is not dischargeable to the extent that it is "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]"  The broad, general definition of fiduciary, involving confidence, trust and good faith, is not applicable in dischargeability proceedings under § 523(a)(4).  Section 523(a)(4) applies only to express trusts (such as those set forth in a document) or technical trusts (those established by law). Constructive or implied trusts, or any trust where the existence of the trust is created merely on the basis of wrongful conduct (often referred to as a trust *ex maleficio*) do not create a fiduciary relationship. *In re Zoldan*, 226 B.R. 767, 772 (S.D.N.Y. 1998).  "Put another away, the fiduciary relationship must exist prior to the act creating the debt; a trust relationship cannot be said to arise merely from the wrongful conduct itself." *Id.*

A plaintiff must prove five elements by a preponderance of the evidence to succeed on a cause of action under Section 523(a)(4) for embezzlement: (1) the entrustment to the debtor of (2) property (3) of another (4) which the debtor appropriates for his or her own use (5) with intent to defraud. *In re Bevilacqua,* 53 B.R. 331, 333-34 (Bankr.S.D.N.Y.1985).  A debtor need not have been a fiduciary to commit embezzlement under Section 523(a)(4). *Id.* at 334; *Moreno v. Schwartz (In re Schwartz),* 36 B.R. 355, 358 (Bankr. E.D.N.Y.1984).

A plaintiff must also establish five elements in order to prove that a debtor committed larceny: (1) the wrongful taking (2) of property (3) of another (4) without the owner's consent (5) with intent to convert the property. *See In re Graziano,* 35 B.R. 589, 594 (Bankr. E.D.N.Y. 1983).  "Larceny does not differ from embezzlement except with respect to the manner in which the funds or property come into the possession of a party." *Id*.

Based upon the findings discussed above, the Court does not find evidence that the debt at issue was the result of fraud or defalcation while acting in a fiduciary capacity, embezzlement,

or larceny.  The Members Agreement did not constitute either an express or technical trust, so no

defalcation could have occurred.  Furthermore, no evidence was offered at trial to show that the

funds contributed by Mr. Ross were wrongfully taken by the Debtor, an essential element of

causes of action for both embezzlement and larceny.

## **CONCLUSION**

For the foregoing reasons, the Court will award judgment to the Debtor, declaring that the

debt in question is dischargeable.  Debtor's counsel is requested to promptly submit an order

consistent with this decision.

Dated: Poughkeepsie, New York
      April 9, 2007                      /s/ Cecelia Morris
                                   CECELIA G. MORRIS, U.S.B.J.